No. 62,514

EUGENE SALOGA, *Appellee*, v. CENTRAL KANSAS CREDIT UNION, *Appellant.*

(783 P.2d 339)

Opinion filed December 8, 1989.

*Kenneth H. Jack*, of Bruce & Davis, of Wichita, argued the cause and was on the briefs for the appellant.

*Stephen W. Brown*, of Megaffin and Brown, of Pratt, argued the cause and was on the briefs for the appellee.

*Anne L. Baker*, of Eidson, Lewis, Porter & Haynes, of Topeka, was on the *amicus curiae* brief for the Kansas Bankers Association.

The opinion of the court was delivered by

MILLER, C.J.: This is a suit filed by Eugene Saloga in which he seeks to recover from Central Kansas Credit Union (Central) the amount of a cashier's check on which he was named as one of two co-payees. Tom Herd was the other co-payee, as well as the remitter, of the check. The check was canceled by Central at the request of Brenda Herd, wife of Tom Herd. The proceeds were redeposited in the Herd account. The trial court found in

Saloga's favor, and the Court of Appeals affirmed. Central appeals. We reverse.

The events leading to this suit began with a dispute about money Tom Herd owed Saloga for work performed. Both men retained counsel to resolve the dispute; Saloga retained Gordon Stull and Herd retained Phil Lunt. The parties agreed that Herd would purchase a $2,968.48 cashier's check made payable both to himself and Saloga. He would deliver this check to Lunt to hold until it could be determined who was entitled to the money. Once this determination was made, the check would be endorsed and delivered to the person entitled to it. Central was not a party to this agreement.

Herd obtained a cashier's check in the amount of $2,968.48 from Central on October 31, 1986. The check was remitted from an account listed as Tom Herd Trucking, which Herd and his wife maintained at Central. The check was made payable to the order of both Herd and Saloga. Herd delivered the check to Lunt that same day.

Lunt and Stull agreed soon after that Herd owed Saloga at least the amount of the cashier's check. Lunt therefore gave Stull the check. Stull made a copy of the check and gave the original back to Lunt with the agreement that Lunt would obtain Herd's endorsement and return the check to Stull.

The check was never returned. Saloga therefore filed suit against Herd on November 21, 1986, for a money judgment on all the money Herd owed him, including the sum which was to have been covered by the cashier's check. The petition notes the existence of the cashier's check in paragraph five and states that Herd had delivered the check to Lunt but had improperly "refused to deliver said check and endorse the same to plaintiff." Saloga has stipulated that Central "was neither a party to [this] action nor . . . receive[d] notice of the action."

Herd was served with a summons and petition in the case on December 11, 1986. On December 27, 1986, Brenda Herd went to Lunt and demanded that he give her the check. Lunt gave it to her, and she took it to Central and requested it be canceled. The check had not been endorsed. Saloga has stipulated that Central "voided" the check and credited the sum back to the Tom Herd Trucking account.

Saloga was awarded a default judgment against Herd on February 2, 1987. The court ordered money judgments against Herd for various unpaid debts arising out of a number of hauling jobs. For the debts covered by the cashier's check, the court ordered Herd to endorse the check and deliver it to the clerk of the court, to be delivered in turn to Saloga. Saloga and the district court were unaware at the time of judgment that the cashier's check had already been canceled. They were also unaware that the Herds had filed for bankruptcy.

When Saloga learned of these facts, he demanded that Central deliver the cashier's check to him or honor the check by paying him the face amount. Upon Central's refusal, Saloga filed this suit on June 1, 1987, claiming Central had wrongfully voided the check.

The matter came to trial before the district court on May 6, 1988, and was decided on the basis of oral testimony and stipulated facts. The court entered judgment for Saloga against Central in the amount of the cashier's check plus interest. It found the check had been delivered to Saloga and that Central had knowledge of the delivery through the filing of the lawsuit between Saloga and Herd. The Court of Appeals affirmed. *Saloga v. Central Kan. Cred. Union*, 13 Kan. App. 2d 357, 770 P.2d 847 (1989).

The district court stated in its findings that the sole issue in the case was whether there was a delivery of the cashier's check to Saloga, and that, if there was, Saloga must prevail. Finding there was such a delivery—by Lunt handing the check to Stull—the court found for Saloga. The court's conclusion that delivery was effected is supported by the facts and the law and is challenged by neither party. Nor does either party dispute the law stated by the Court of Appeals in its opinion affirming the trial court: "A cashier's check in possession of the remitter raises a presumption it has not been delivered to the payee, and, unless different facts are *made known* to a financial institution, it has the right to act on that presumption." (Emphasis supplied.) *Saloga*, 13 Kan. App. 2d 357, Syl. ¶ 2. See *Gillespie v. Riley Management Corp.*, 59 Ill. 2d 211, 319 N.E.2d 753 (1974).

The sole issue before us is whether the filing of a lawsuit between the remitter and the payee of a cashier's check gives a

financial institution constructive notice sufficient to overcome this presumption of nondelivery and renders it liable to the payee for cancellation of the check.

Let us begin our analysis of the issue with a clear understanding of the role a cashier's check plays in commercial practice. Professor Bailey provides an excellent summary in Brady on Bank Checks:

"A cashier's check is simply a bill of exchange or a draft drawn by a bank on itself. Technically speaking 'cashier's checks' are signed by the cashier of a bank who is the chief financial officer of the institution. In practice, many such checks are signed by other bank officials with signing authority and are sometimes referred to by such terms as 'officer's checks,' 'treasurer's checks,' or the like. In many instances, cashier's checks are purchased by a customer of the issuing bank to be used for a payment by the purchaser when a check signed by an authorized representative of the bank itself is desired. Such a purchaser is often called the 'remitter.' The purchaser is not a party to the cashier's check itself unless named as payee or unless the purchaser adds his own signature or indorsement to the instrument.

"Under pre-Code law, it was said that a cashier's check was accepted (certified) by the issuing bank upon its issuance. The same is true under the UCC.

"A bank that issues a cashier's check impliedly authorizes the purchaser thereof to deliver or to withhold delivery of the check to the payee of the check. . . . Prior to valid delivery, the purchaser of a cashier's check may cause it to be canceled." Brady on Bank Checks ¶ 1.17 (Bailey 6th ed. 1987).

The Uniform Commercial Code (UCC) does not specifically classify cashier's checks, but it is generally accepted that they are classified under the UCC as negotiable instruments, a subcategory of commercial paper. See K.S.A. 84-3-104. There is no specific statement in the UCC that the issuing financial institution may not be held to constructive notice when canceling an instrument. However, other provisions of the UCC show a reluctance to tie negotiable instruments to the doctrine of constructive notice. For example, K.S.A. 84-3-304 generally defines when a purchaser of an instrument has notice of a claim or defense. Subsection (5) provides: "The filing or recording of a document does not of itself constitute notice within the provisions of this article to a person who would otherwise be a holder in due course." The Official Comment states that this subsection

"removes an uncertainty arising under the original Act as to the effect of 'constructive notice' through public filing or recording."

It is generally accepted that a cashier's check "is strictly commercial paper and every holder is presumed to be a holder for value, and the burden of showing that he is not a bona fide holder rests upon those who assert it." 5B Michie on Banks and Banking § 251 (1983).

Professor Bailey states that:

"The fact that a check is in the possession of the drawer raises a presumption that it has not been delivered to the payee, and, *unless notice of a different state of facts is brought home to the drawee bank*, it has a right to act upon that presumption. This applies to a certified check, as well as to one that is not certified, with the result that, where the drawer of a check has it certified, and later appears at the drawee bank with the check in his possession and requests that the certification be canceled and the amount re-credited to his account, the bank is within its rights in acceding to his request.

. . . .

"Not only is there a presumption against delivery if the drawer of a check still has it in his possession, but it would seem that *the same presumption exists where the drawer had delivered the check, but later came back into possession of it*. This would seem to apply even where the check had not been endorsed by the payee." (Emphasis supplied.) Brady on Bank Checks ¶ 5.5.

Accord 5B Michie on Banks and Banking § 257.

Saloga attempts to characterize this as a "stop payment" case or as one in which the cashier's check was presented for payment and was honored despite his lack of endorsement. As the stipulated facts show, however, this is instead a case of cancellation by the remitter. It is therefore properly treated under the rules indicated above rather than those cited by Saloga. Saloga does rely on a cancellation case which is appropriate and which we will set out in some detail.

In *Gillespie v. Riley Management Corp.*, 59 Ill. 2d at 213-14, plaintiff Gillespie had contracted with Riley Management Corporation to build and sell her an apartment building. She was required to make an earnest money payment of $25,000, which was to be held by Riley in an escrow account requiring both her signature and that of a representative of Riley's for withdrawal. After receiving a $25,000 check from Gillespie, the president of Riley decided that, rather than set up an escrow account, he

would purchase a cashier's check payable to both Riley and Gillespie. He told Gillespie this would save escrow charges and assured her both signatures would be required to negotiate the check. Riley's bank, however, refused to issue Riley the cashier's check until Gillespie's $25,000 check deposited in Riley's account had cleared. At the time of Riley's request for the cashier's check, it had only $13,000 in its account. After clearance of Gillespie's check, the bank issued the jointly payable cashier's check to Riley and debited Riley's account. Riley returned the check to the bank a month later without Gillespie's endorsement and the bank honored its request to cancel the check and issue two new cashier's checks totaling $25,000 payable to Riley only.

Upon Gillespie's inevitable inability to collect from Riley, she sued the issuing bank for conversion. The bank argued that a purchaser of a cashier's check has the right to have it canceled under U.C.C. § 3-605 (K.S.A. 84-3-605). Gillespie argued that delivery had occurred when the check was picked up by Riley as co-payee, and thereafter, under U.C.C. § 3-116 (K.S.A. 84-3-116), the check could be negotiated, discharged, or enforced only by both payees. The court construed the two sections together and found the critical question to be whether Riley was acting as a purchaser or as a joint payee when it returned the check to the bank for cancellation. The court found just because the purchaser was also a joint payee did not alter the presumption that possession by the purchaser allows cancellation. Its discussion is particularly helpful when applied to the issue before us. The court said:

"One acquires a cashier's check for the purpose of assuring the payee that there are the necessary funds contemplated by a transaction, and the check, like the money it represents, cannot be countermanded or revoked after the payee has received it. However, often a contemplated transaction does not materialize. The purchaser may then be left with a cashier's check purchased by him, but payable to someone with whom he no longer is commercially involved. It would impose an unwarranted commercial burden to require the purchaser to obtain the endorsement of such a payee to have the cashier's check honored or canceled. Until the purchaser places such a check in the stream of commerce, he must, of practical, commercial necessity, be able to cancel the check upon its surrender to the bank." 59 Ill. 2d at 218.

Nevertheless, the Illinois Supreme Court found that, due to the bank's earlier refusal to issue a cashier's check until Gillespie's check cleared, the request for cancellation by Riley without Gillespie's endorsement created an unusual situation which overcame the usual presumption of nondelivery. The court therefore held the bank had a duty to inquire about delivery and the lack of endorsement, and found the bank liable for Gillespie's loss. We cannot follow that court's reasoning in the case at bar, for no such unusual situation exists. Central had no contact with Saloga, or money it knew to be Saloga's, and there is no evidence it knew what purpose the check was intended to serve.

A cashier's check is useful in conducting business because it is regarded substantially as the money it represents. See *Meador v. Ranchmart State Bank*, 213 Kan. 372, 376, 517 P.2d 123 (1973). A finding that the filing of a lawsuit gives a financial institution constructive notice of the delivery of a cashier's check would seriously impair the value of a cashier's check in conducting business and go beyond the general perception of the use of such checks. For example, cashier's checks frequently accompany bids submitted at public lettings and proposed contracts. Checks from unsuccessful bidders or those whose contract proposals fall through are canceled by the issuing bank at the remitter's request. Imposition of constructive notice of pending litigation between the remitter and the named payee would greatly hamper this commercial practice.

A financial institution has the right to cancel a cashier's check in the hands of the remitter upon the presumption that the check has not been delivered to the payee, unless different facts are *made known* to it. We hold that a financial institution is not liable to a named payee for cancellation of an unendorsed cashier's check in the possession and at the request of the remitter although it had constructive notice of a pending lawsuit between the remitter and the payee. Constructive notice of the lawsuit does not "make known" to the institution facts which overcome the presumption of nondelivery.

The judgment of the Court of Appeals affirming the district court is reversed, and the judgment of the district court is reversed.

SIX, J., not participating.